United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRAVIS NEAL ELLIOTT,<br><br>   Petitioner,<br><br> v.<br><br>GARY SWARTHOUT, Warden,<br><br>   Respondent.<br>_____/ | No. C-12-2568 EMC (pr)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

## I. INTRODUCTION

Travis Neal Elliott filed this *pro se* action seeking a writ of habeas corpus under 28 U.S.C. § 2254. The matter is now before the Court for consideration of the merits of the habeas petition. For the reasons discussed below, the petition will be denied.

## II. BACKGROUND

A. The Crimes and Trial

The California Court of Appeal summarized the evidence of the crimes presented at trial as follows:

> **A. The Killing and Investigation**
>
> Defendant [Travis Neal Elliott] lived with his stepfather, Irvin Scales, and Michelle Thompson, a family friend, in Pittsburg.[1]
>
> Thompson returned home around 10:00 o'clock on the evening of March 4, 2005. She checked on Scales and saw that he was asleep

---

[1] [Opinion Footnote 1] Defendant's mother, Hazel Scales, was staying with an elderly relative who needed care.

in his bed, snoring, with the light and television on. She went to her own room. Defendant called her to come out into the garage, and she joined him and had a conversation. Defendant's conversation tended to "jump around." Thompson could smell alcohol on him, and saw that his eyes were droopy and somewhat red. Thompson returned to her room, got into bed, and watched television.

While Thompson was watching television, defendant knocked on her door and asked her through the closed door to give him a ride to an area known for drug sales. She refused, and suggested he ask his father. [Footnote omitted]. Defendant said his father would not let him use the car. Thompson had previously given defendant a ride to an area known for drug use; on that occasion, he left the car, went inside somewhere, and returned a minute or two later.

Thompson heard defendant ask Scales if he could use the car. Scales refused, saying defendant had not put gas in the car the last time he had used it. Scales's tone was firm but not angry. Defendant was using a normal, pleasant tone of voice, and did not sound angry, although his tone became somewhat frustrated when Scales continued to refuse.

Defendant again asked Thompson through her door for a ride, and she refused. Thompson heard defendant's voice in the living room, apparently either talking to himself or speaking on the phone. She then heard footsteps going from the living room to Scales's bedroom, then "ruffling" noises from Scales's room as if someone was shuffling paper. She did not hear any angry voices or sounds of a struggle. She then heard a door close and a vehicle speed out of the driveway.

Thompson got up and opened her bedroom door. She saw that Scales's bedroom door was closed, although he usually left it open. She heard a dripping sound, opened Scales's bedroom door, tapped Scales on the shoulder, and saw that he had blood on his nose and mouth.

Afraid defendant would return, Thompson went to the home of relatives, who called the police when she told them what had happened. When Thompson returned to the house shortly afterwards, police cars were already there.

The first officers on the scene had received a call from dispatch at 12:48 a.m. on March 5. When they arrived, they found Scales lying on his bed in a pool of blood. He had no pulse. The television set in his bedroom was on. Blood was found in various places in the house, including Scales's bedroom door, defendant's bedroom door, and the back screen door.

Scales had died of extensive blunt force head injury, consistent with injuries caused by a sledge hammer. Death would have occurred almost immediately after the blows. From the pattern of blood on the bed, it appeared that he had been lying on his side when most of the blows fell, and that he had then been rolled over onto his back. Two sets of keys and a wallet were found under his pillow.

In the early hours of the morning of March 5, defendant was found driving alone in Scales's pickup truck and was brought to the Pittsburg Police Department. He saw Officer Ernie Ferraro, and asked if he was "Pittsburg." Ferraro said he was a Pittsburg police officer, and defendant asked if he had been to the house. Ferraro said he had not, and defendant said, "Well, it was an accident." Defendant was wearing white clothing, and had bloodstains on his pant leg, sweatshirt, and shoe.

One of the stains on defendant's pant leg was in a shape similar to that of a sledge hammer found outside the house. The sledge hammer had blood and hair on it. A silhouette on a nearby dirt patch suggested the sledge hammer had been lying there earlier.

DNA testing excluded defendant as the source of the blood on the clothes and sledge hammer. The DNA profile on the sledge hammer and clothing matched that of Scales.

A blood sample taken from defendant at 4:00 o'clock on the morning of March 5 – more than three hours after police had been dispatched to the scene of the killing – showed the presence of cocaine, probably ingested within two or three hours of the blood draw, or at approximately 1:00 o'clock in the morning.

**B.      Testimony About Defendant's History**

Defendant's half sister, Shanelle Scales Preston, testified that defendant had lived away from the family home starting in 1994 or 1995, and returned in August 2004. During the time he was away, Scales would visit him almost every month, and Preston also visited him, though not as frequently. At one point defendant left the family home again and lived somewhere else for two or three months. When he returned in January 2005, he appeared to be frustrated or upset.

Preston also recalled an occasion in January 2005, in which defendant had borrowed Scales's truck and exchanged it for drugs. Scales later recovered the truck.

Vickie Johnson, who was Scales's niece, testified that a couple days before Scales was killed, defendant came to her house and tried to sell her brand-new shirts, with the tags still on them. Scales was upset when Johnson told her about the incident, because he had just taken defendant shopping for clothes. Based on defendant's behavior, Johnson believed he was using drugs, and that he was trying to sell the shirts for drugs.

The day before Scales's death, he spoke with Johnson on the telephone. Scales was crying, and said defendant was not acting like himself and that Scales was afraid to be with him.

On cross-examination, Johnson testified that she had become aware that defendant owed money to drug dealers. According to Johnson, defendant had been selling drugs; however, rather than selling drugs, he would use them himself, and as a result he owed

3

money to other drug dealers. Defense counsel asked when defendant had owed the money, and Johnson answered, "This was before Travis went to prison he owed money."

#### C. Evidence Regarding Transfer of Title to House

Earlier on the day of March 4, 2005, Preston and her then-fiancé, Damon Preston,[2] visited her parents at their house. They had been discussing transferring title of the family home into Preston's name, because Scales had health problems and was afraid that he and Hazel might lose the house if he had to go into a convalescent home. Scales also wanted to promote Preston's financial security. Preston had not been involved in any conversations with defendant about the proposed transaction. Scales and Hazel signed paperwork to transfer title that day. Preston would be paying substantially less than the market value of the house. Damon later took defendant to buy a bottle of brandy. [Footnote omitted].

Defendant was in the house when the paperwork was being filled out. Papers were on the dining room table, which was next to the kitchen. Defendant was in the kitchen preparing food, then went into his bedroom. Defendant did not ask Preston any questions about what the others were doing.

Damon later told a detective that defendant had asked what he, Preston, and her parents were doing and what the paperwork was, and he told defendant he should take that question up with his parents. However, at trial Damon testified – as did Preston – that defendant seemed unconcerned about the paperwork.

Called as a defense witness, Preston testified that her parents had wanted defendant's name to be on the house title as well, but that he could not qualify for the necessary loan because he was not working.

Cal. Ct. App. Opinion at 2-5.

B.   Procedural History

At a jury trial in Contra Costa County Superior Court, Petitioner was found guilt of first-degree murder, *see* Cal. Penal Code § 187, with an allegation that Petitioner personally used a deadly or dangerous weapon, a sledgehammer, in the commission of the offense (*id.* § 12022(b)(1)). The jury also found true allegations that Petitioner had two prior serious felony convictions and two

---

[2] [Opinion Footnote 3] Because Preston shares the same name as Damon, to whom she was married at the time of trial, we shall refer to Damon by his first name. For the same reason, we shall refer to Scales's wife by her first name, Hazel  We intend no disrespect.

4

prior prison terms. On December 12, 2008, Petitioner was sentenced to a total term of 31 years to life in prison.

Petitioner appealed. On February 15, 2011, the California Court of Appeal filed an unpublished opinion affirming the judgment, s*ee* Resp. Ex. 4, and on May 18, 2011, the California Supreme Court denied Petitioner's petition for review.

Petitioner subsequently filed his federal petition for review on May 18, 2012. The Court issued an order to show cause why the petition should not be granted. Respondent filed an answer and Petitioner filed a traverse. The matter is ready for decision on the merits.

### III.  JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the petition concerns the execution of a sentence for a prisoner convicted in Contra Costa County, California, which is within this judicial district. 28 U.S.C. §§ 84, 2241(d).

### IV.  EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. *See* 28 U.S.C. § 2254(b), (c). The parties do not dispute that the state judicial remedies were exhausted for the claims in the petition.

### V.  STANDARD OF REVIEW

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254 is the proper jurisdictional basis for a habeas petition attacking the execution of the sentence by a petitioner in custody pursuant to the judgment of a state court. *See White v. Lambert*, 370 F.3d 1002, 1004 (9th Cir. 2004), *overruled on other grounds by Hayward v. Marshall*, 603 F.3d 546, 554 (9th Cir. 2010).

The Antiterrorism And Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review. A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

## VI. DISCUSSION

A. <u>Claim of Erroneous Introduction of Evidence</u>

In his first claim, Petitioner maintains that the trial court committed reversible error when it allowed the prosecution to introduce evidence that victim Scales and his wife had transferred title to their house to their daughter on the day that Scales was murdered. The California Court of Appeal rejected this claim in a reasoned opinion as follows:

> A trial court has broad discretion in determining the admissibility of evidence. "The exercise of discretion is not grounds for reversal unless '"the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest

6

> miscarriage of justice.'" [Citations.]" (*People v. Ochoa* (2001) 26 Cal. 4th 398, 437-438.)
>
> We see no abuse of discretion here. Defendant rightly points out that speculation is not evidence. (*People v. Waidla* (2000) 22 Cal. 4th 690, 735.) However, the jury could rationally conclude from the evidence that defendant was aware documents were being signed, that he asked Damon about the papers, that Damon advised defendant to speak with Scales and Hazel about the matter, and that defendant was concerned about the transaction. We agree that the evidence that the transfer of title formed part of defendant's motive was not strong; however, there is no reason to conclude the jury would give it undue weight. Bearing in mind the trial court's broad discretion, we cannot conclude this was error.
>
> In any case, even if the evidence should not have been admitted, we see no possibility that defendant was prejudiced. Defendant argues that without the evidence suggesting his motive to kill Scales arose earlier in the day, the jury would have been less likely to conclude he had premeditated, and might well have convicted him of second degree rather than first degree murder. On the facts of this case, we reject this contention. . . . The evidence showed that defendant asked Scales if he could use his truck, that Scales refused, and that neither sounded angry, although defendant began to sound frustrated as Scales continued to refuse. After making a final attempt to get Thompson to drive him to an area known for drug dealing, defendant went outside, got a sledge hammer, went to Scales's room, and delivered several blows to his head, one of them severe enough to cause death within seconds. The evidence indicates he then retrieved the keys to Scales's truck – apparently by moving his body aside – went outside, discarding the sledge hammer near where it had originally lain, and drove the truck away. The level of cocaine in his system several hours later suggested he ingested cocaine after killing Scales.
>
> . . . .
>
> Based on both the evidence and the position taken by the prosecutor, we are satisfied that defendant's actions in going outside for the sledge hammer and returning to Scales's bedroom to strike him with it formed the basis for the jury's conclusion that he had premeditated before killing Scales, and this conclusion would have been the same even if it had not heard the evidence of the transfer of title.

Cal. Ct. App. Opinion at 6-8.

The rejection of this claim by the state appellate court was neither contrary to nor an unreasonable application of clearly established United States Supreme Court authority. In addition, the state court's decision was not based on an unreasonable determination of the facts.

Petitioner's burden in demonstrating a due process violation based on an evidentiary decision is substantial. *Estelle v. McGuire*, 502 U.S. 62, 68 (1991); *Boyde v. Brown*, 404 F. 3d 1159, 1172

7

(9th Cir. 2005). The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. *See Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999); *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir. 1986). The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that trial court's admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly established Federal law under section 2254(d)). The due process inquiry in federal habeas review is whether the admission of evidence was so prejudicial that it rendered the trial fundamentally unfair. *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995); *Colley*, 784 F.2d at 990. Only if there are *no* permissible inferences that the jury may draw from the evidence can its admission violate due process. *See Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991).

In Petitioner's case, as the state court reasonably found, there was a permissible inference that the jury could have drawn from the testimony regarding the transfer of title. *See Jammal*, 926 F.2d at 920. It would have been permissible for the jury to infer that defendant was aware of certain documents being signed and that he was concerned about the transaction. Cal. Ct. App. Opinion at 6. Furthermore, Petitioner has not shown that any alleged error was prejudicial to him. Even if a Petitioner meets the requirements of section 2254(d), habeas relief is warranted only if the constitutional error at issue had a substantial and injurious effect or influence in determining the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993). Under this standard, petitioners "may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Brecht*, 507 U.S. at 637, citing *United States v. Lane*, 474 U.S. 438, 439 (1986). Here, Petitioner maintains that without the testimony regarding the house transfer, the jury would not have found him guilty of first-degree murder. As the state court reasonably found and as the record confirms, however, there was significant evidence establishing premeditation and deliberation. Cal. Ct. App. Opinion at 6-8. Given the strength of the evidence against him, Petitioner cannot establish that any alleged

evidentiary error was prejudicial to him. *Brecht*, 507 U.S. at 637. Therefore, this claim must be denied.

B.     Claim of Errors Relating to Witness's Reference to Petitioner's Prior Time in Prison

In his second claim, Petitioner maintains that the trial court erred in denying his motion for mistrial after a prosecution witness stated on cross-examination that Petitioner had been incarcerated in the past. Petitioner also alleges that it was prosecutorial misconduct for the prosecutor to fail to adequately instruct the witness that there was a pretrial order in place preventing reference to Petitioner's prior prison term. Finally, Petitioner maintains that it was ineffective assistance for his counsel to have suggested and stipulated to the trial court's statement to the jury that Petitioner had been incarcerated from 1995-2004 for a non-violent drug offense. The California Court of Appeal rejected this claim in its entirety in a reasoned opinion as follows:

> The prosecutor sought to introduce evidence of defendant's prior incarceration, arguing that the evidence at trial would show Scales did not trust defendant, which he contended was the reason Scales and his wife signed the house over to Preston, and the prior incarceration was relevant to explain the relationship between defendant and Scales. Defendant objected to any evidence of his incarceration. The trial court proposed informing the jury that six months before the killing, defendant had been living in a facility for a nonviolent offense. In doing so, the court said that if one of the witnesses mentioned something about a custodial setting, it would be "a problem," and that if the jury were told defendant had been in prison for ten years before the killing, "there would be a problem and that they would have a hard time dealing with that."
>
> As has been described, at trial [Vickie] Johnson testified at cross-examination that defendant owed money to drug dealers because he had used the drugs he was supposed to be selling.[3] Defense counsel asked when defendant owed the money, and Johnson said it had happened before defendant went to prison.
>
> Outside of the presence of the jury, defendant moved for a mistrial, and the trial court denied the motion. The prosecutor acknowledged he had not told Johnson not to mention defendant's imprisonment, and noted that his direct examination had been limited to events that occurred the week before the killing. At the suggestion of defense counsel, the trial court then told the jury that defendant had been in prison from 1995 until 2004 for the crime of sale of cocaine, which was a nonviolent offense. The court also directed the jury "not to consider the fact of the defendant's prior incarceration for any

---

[3] [Opinion Footnote 7] Defendant's theory at trial was that Scales was killed by someone else, possibly someone connected with defendant's drug use.

9

reason other that to put Ms. Johnson's testimony in perspective when she's talking about the dates at issue and her knowledge of the drug debts owed and when they were owed."

Defendant contends the prosecutor committed misconduct by failing to tell Johnson not to mention defendant's prison term, that the trial court erred by denying his motion for a mistrial, that his trial counsel rendered ineffective assistance by proposing that the trial court make the statement to the jury, and that the limiting instruction was insufficient because it only instructed the jury to consider the *incarceration* – rather than his *conviction* – for a limited purpose. According to defendant, if the jury had not heard that he had served time for selling cocaine, a crime of moral turpitude (*People v. Vera* (1999) 69 Cal. App. 4th 1100, 1103), it might not have concluded he premeditated Scales's murder, and might well have convicted him of only second degree murder.

"'A trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged, and we use the deferential abuse of discretion standard to review a trial court denying a mistrial.' [*Citation*.]" (*People v. Williams* (2006) 40 Cal. 4th 287, 323.) While a witness's volunteered statement may, in some circumstances, cause incurable prejudice, it is proper to deny a motion for a mistrial where the prejudice is dispelled by the court's admonition. (*People v. Ledesma* (2006) 39 Cal. 4th 641, 683; *People v. Wharton* (1991) 53 Cal. 3d 522, 565.)

We see no possibility that Johnson's statement affected the result of the trial. First, the evidence showed defendant had a history of drug use, and defendant himself elicited testimony from Johnson that defendant had previously sold drugs, that he had debts to drug dealers, and that drug dealers might use violence in order to collect their debts, evidence that supported his defense that the killing was the work of someone connected with his drug history. There is no reason to conclude that the news that defendant had served time for selling drugs would have made the jury more likely to conclude he premeditated before killing Scales.

Moreover, any prejudice that might have existed was cured by the limiting instruction. A jury is presumed to understand and follow the court's instructions. (*People v. Holt* (1997) 15 Cal. 4th 619, 662.) We recognize that the trial court directed the jury only to consider defendant's *incarceration* for the limited purpose of putting into perspective Johnson's testimony about the debts that were owed and their timing. However, the evidence in question referred only to defendant serving time in prison for selling cocaine. No reasonable jury would have concluded it could consider defendant's *incarceration* only for a limited purpose but the underlying *conviction* for any other purpose, such as to show his propensity to commit bad acts. In the circumstances, the trial court did not abuse its discretion in denying defendant's motion for a mistrial.

For the same reasons, we reject defendant's contention that his counsel rendered ineffective assistance in proposing that the trial court inform the jury that he went [to] prison from 1995 to 2004 for selling

10

> cocaine. As we have explained, to prevail on such a claim, defendant must show not only that his counsel's performance was deficient, but also that he was prejudiced, that is, that there is a reasonable probability he would have obtained a more favorable result but for counsel's failings. (*Dennis, supra*, 17 Cal. 4th at pp. 540-541.) We have already concluded defendant did not suffer prejudice, and we reject his claim on that ground.
>
> Finally, defendant has not shown the judgment should be reversed because the prosecutor committed misconduct in not telling Johnson not to mention his incarceration. "To constitute a violation under the federal Constitution, prosecutorial misconduct must 'so infect[] the trial with unfairness as to make the resulting conviction a denial of due process.' [Citations.] 'But conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' [Citation.]" (*People v. Valdez* (2004) 32 Cal. 4th 73, 122 (*Valdez*).) Moreover, "the federal Constitution does not require (and the state Constitution does not permit) the reversal of a criminal conviction unless the misconduct deprived defendant of a fair trial or resulted in a miscarriage of justice." (*People v. Hinton* (2006) 37 Cal. 4th 839, 865.)
>
> We see no "'deceptive or reprehensible methods'" here. (*Valdez, supra*, 32 Cal. 4th at p. 122.) The prosecutor did not elicit the testimony about defendant's incarceration; rather, his examination of Johnson was limited to events in the days preceding the killing, and he did not question her about defendant's history of selling drugs. In any case, as we have already concluded, any prejudice that might have existed was cured by the limiting instruction. Defendant was not deprived of a fair trial, and there was no miscarriage of justice.

Cal. Ct. App. Opinion at 9-12.

The rejection of this claim by the state appellate court was neither contrary to nor an unreasonable application of clearly established United States Supreme Court authority. In addition, the state court's decision was not based on an unreasonable determination of the facts.

First, Petitioner cannot demonstrate that the trial court's denial of his motion for a mistrial was reversible error. As discussed *supra* in the analysis of Petitioner's first claim for relief, the admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. *See Henry*, 197 F.3d at 1031; *Colley,* 784 F.2d at 990. Because the Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ", *Holley v.*

11

*Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009), Petitioner must demonstrate that the evidence in question was so arbitrary or so prejudicial that it rendered the trial fundamentally unfair. *Walters*, 45 F.3d at 1357; *Colley*, 784 F.2d at 990. This Petitioner cannot do.

Petitioner maintains that he was prejudiced because the statement regarding his incarceration made it more likely for the jury to conclude he was guilty of first-degree murder. As the state court reasonably found, however, there was ample evidence of premeditation and deliberation. Cal. Ct. App. Opinion at 7-8. In addition, because there was significant properly-admitted evidence regarding Petitioner's drug use, drug dealing and drug debts, there was no reasonable possibility that "the news that [Petitioner] had served time for selling drugs would have made the jury more likely to conclude he premeditated before killing Scales." Cal. Ct. App. Opinion at 10.

Furthermore, any possible prejudice from Johnson's statement was cured by the limiting instruction given by the trial judge. Juries are presumed to follow a court's limiting instructions with respect to the purposes for which evidence is admitted, *Aguilar v. Alexander*, 125 F.3d 815, 820 (9th Cir. 1997), and Petitioner can point to no evidence indicating that the jurors at his trial ignored the court's instruction. In addition, to the extent that Petitioner is arguing that the statement regarding his past time in prison was improper propensity evidence, the United States Supreme Court has left open the question of whether admission of propensity evidence violates due process. *See Estelle*, 502 U.S. at 75 n. 5. Based on the Supreme Court's reservation of this issue as an "open question," the Ninth Circuit has held that a petitioner's due process right concerning the admission of propensity evidence is not clearly established as required by AEDPA. *Alberni v. McDaniel*, 458 F.3d 860, 866-67 (9th Cir. 2006); *accord Mejia v. Garcia*, 534 F.3d 1036, 1046 (9th Cir. 2008) (reaffirming *Alberni).* Accordingly, such an argument in unavailing, and Petitioner is not entitled to relief on this ground.

Second, Petitioner cannot demonstrate that his counsel rendered ineffective assistance in proposing, after the trial judge denied the motion for a mistrial, that the jury be instructed that Petitioner had been incarcerated for a nonviolent drug offense. To prevail on a claim of ineffective assistance of counsel, Petitioner must show both that counsel's performance was deficient and that the deficient performance prejudiced Petitioner's defense. *Strickland v. Washington*, 466 U.S. 668,

686-688 (1984). To prove deficient performance, Petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. *Id.* at 688. To prove counsel's performance was prejudicial, Petitioner must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as the result of the alleged deficiencies. *See Strickland*, 466 U.S. at 697; *Williams v. Calderon*, 52 F. 3d 1465, 1470 & n.3 (9th Cir. 1995) (approving district court's refusal to consider whether counsel's conduct was deficient after determining that petitioner could not establish prejudice). Here, as the state court reasonably found, Petitioner cannot demonstrate that he suffered any prejudice due to his counsel's alleged deficiency. Cal. Ct. App. Opinion at 11. As discussed *supra,* there is no evidence that, had the jury not known that Petitioner served a prison sentence for a nonviolent drug offense, it would have found Petitioner guilty of second-degree murder instead of first-degree murder. The state court found, and the record confirms, that there was ample evidence establishing Petitioner's premeditation and deliberation, as well as his drug use and drug dealing. Because Petitioner cannot demonstrate prejudice, he is not entitled to relief on this ground. *See Strickland*, 466 U.S. at 697; *Brecht*, 507 U.S. at 637-638.

Finally, Petitioner has not demonstrated that the prosecutor engaged in misconduct. The Supreme Court has held that when reviewing a habeas claim of prosecutorial misconduct, the relevant inquiry is whether the prosecutor's actions "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citing *Donnellly v. DeChristoforo*, 416 U.S. 637 (1974). "Moreover, the appropriate standard of review for such a claim on writ of habeas corpus is the narrow one of due process, and not the broad exercise of supervisory power." *Id.* (citations omitted).

As the state court reasonably found, there was no prosecutorial misconduct. Cal. Ct. App. Opinion at 11-12. The prosecutor did not elicit the statement regarding Petitioner's time in prison; rather, the statement was in response to a question by Petitioner's trial counsel on cross-

13

examination. The record confirms that the prosecutor did not ask Johnson any questions that might touch on Petitioner's time in prison, and there is no evidence that the prosecutor encouraged Johnson to refer to Petitioner's incarceration. Moreover, because Petitioner cannot show that any alleged misconduct resulted in a trial so unfair that Petitioner was denied due process, he cannot demonstrate that he is entitled to relief. *See Darden v. Wainwright*, 477 U.S. at 81. In sum, Petitioner's entire claim relating to Johnson's statement must be denied.

C.      Claim of Cumulative Error

In his third claim, Petitioner maintains that there were cumulative errors at his trial that require reversal. The California Court of Appeal rejected this claim, stating: "We find no cumulative error, and are satisfied that defendant suffered no prejudice." Cal. Ct. App. Opinion at 12.

The rejection of this claim by the state appellate court was neither contrary to nor an unreasonable application of clearly established United States Supreme Court authority. In addition, the state court's decision was not based on an unreasonable determination of the facts.

In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned. *See Alcala v. Woodford*, 334 F.3d 862, 893-895 (9th Cir. 2003) (reversing conviction where multiple constitutional errors hindered defendant's efforts to challenge every important element of proof offered by prosecution); *Thomas v. Hubbard*, 273 F.3d 1164, 1179-1181 (9th Cir. 2002) (reversing conviction based on cumulative prejudicial effect of numerous errors). Where there is no single constitutional error, however, nothing can accumulate to the level of a constitutional violation. *See Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002); *Fuller v. Roe*, 182 F.3d 699, 704 (9th Cir. 1999).

Here, as detailed *supra*, Petitioner did not demonstrate that any constitutional errors occurred at his trial. Moreover, having found no prejudice from the errors considered separately, this Court finds no cumulative prejudice. *See Thompson v. Calderon*, 109 F. 3d 1358, 1369 (*citing Cooper v. Fitzharris*, 586 F. 2d 1325, 1333 (9th Cir. 1978)), *rev'd.* 120 F. 3d 1045, *opinion reinstated*

*Calderon v. Thompson*, 523 U.S. 538 (1998). Thus, Petitioner's claim of cumulative error must fail and he is not entitled to federal habeas corpus relief on this claim.

### VII. CONCLUSION

The petition for writ of habeas corpus is **DENIED** on the merits. The Clerk shall close the file.

Rule 11(a) of the Rules Governing Section 2254 Cases now requires a district court to rule on whether a petitioner is entitled to a certificate of appealability in the same order in which the petition is denied. Petitioner has failed to make a substantial showing that his claims amounted to a denial of his constitutional rights or demonstrate that a reasonable jurist would find the denial of his claims debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Consequently, no certificate of appealability is warranted in this case.

IT IS SO ORDERED.

Dated: June 12, 2013

_____
EDWARD M. CHEN
United States District Judge